# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 13-70022

United States Court of Appeals
Fifth Circuit

**FILED**

October 14, 2014

RAPHAEL DEON HOLIDAY,

Lyle W. Cayce
Clerk

Petitioner–Appellant

v.

WILLIAM STEPHENS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent–Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:11-CV-01696

Before JONES, CLEMENT, and PRADO, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:*

Petitioner Raphael Holiday ("Holiday") was convicted on multiple counts of capital murder and sentenced to death in Texas. He applies to this Court for a certificate of appealability ("COA") for numerous claims on which the district court denied him habeas relief and denied him a COA. For the reasons below, we deny Holiday's application on each claim he presents.

---

\* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-70022

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Tami Lynn Wilkerson ("Wilkerson") and Holiday lived together with Wilkerson's two daughters, Tierra and Jasmine, and with Wilkerson and Holiday's baby, Justice. *Holiday v. State*, Nos. AP-74,446, 74,447, 74,448, 2006 Tex. Crim. App. Unpub. LEXIS 737, *2–3 (Tex. Crim. App. Feb. 8, 2006) (hereinafter "TCCA Direct App."). Their home was about a mile or two from the home of Wilkerson's mother, Beverly Mitchell ("Mitchell"). At the time of the instant offenses, Tierra was seven years old, and Jasmine five. *Id.* at *3.

On direct appeal, the Texas Court of Criminal Appeals ("TCCA") summarized the evidence leading up to the instant offenses as follows:

> In March of 2000, Wilkerson learned that Holiday had sexually assaulted Tierra. Wilkerson filed charges against Holiday and obtained a protective order against him. Wilkerson continued to live in the house in Madison County and Holiday moved out. In the following months, Holiday repeatedly contacted Wilkerson by phone, stating that he wanted to reconcile and that he wanted to see Justice, and threatening to come to the house while the children were at home. Despite the protective order, Wilkerson met with Holiday numerous times between April and the end of August, in an effort to "handle" Holiday and deal with his threats, and to allow him to see Justice. In August, Holiday came to the restaurant where Wilkerson was working. Wilkerson locked herself in the office. When Holiday tried to pick the lock on the office door, Wilkerson called the police, who came and removed Holiday from the premises. About a week before the instant offenses, Holiday called Wilkerson and asked for her help in jumping his car. When Wilkerson arrived to assist him, Holiday took her keys, told her he had two guns, forced her to have sex with him, and then forced her into the car and threatened to crash the car and kill them both. Wilkerson finally convinced Holiday to let her go. After that incident, Wilkerson stopped taking Holiday's phone calls.

*Id.* at *3–4. The TCCA then summarized the events surrounding the offenses as follows:

2

No. 13-70022

Around 11 p.m., on the evening of September 5, 2000, one of Wilkerson's daughters heard glass breaking outside. Wilkerson looked out of the window and saw a figure walking toward the house. She called her mother, Beverly Mitchell, and asked her to come over. Mitchell and Wilkerson's uncle, Terry Keller ["Keller"], soon arrived at Wilkerson's house. Keller had a shotgun and began walking around the house and yard. Mitchell took Tierra and Jasmine to her car. When she went back inside the house to get Justice, she picked up the telephone to dial 911. As she was holding the phone, Holiday walked in, grabbed the phone out of her hand, and threw it against the wall. When Wilkerson came into the room and saw Holiday, she ran out of the house to go for help. Holiday asked Mitchell how she had known to come to the house because Holiday said he had cut the phone line. Holiday said he was going to make Wilkerson pay for what she had done by taking his baby away. When Keller came into the house, Holiday held Mitchell in a head-lock with a gun to her head until Keller put his gun down and Holiday retrieved it. Keller testified that Holiday began "ranting and raving" that he was not "going to take the rap" on the charges filed against him, that he was "going to take care of it," and that he was "going to burn the house down with everyone in it." Holiday then poured gasoline around and on the hood of the car where Tierra and Jasmine were. He again said Wilkerson was going to pay for what she had done. He tried to light the gasoline, but it would not ignite. Holiday forced everyone back into the house, shooting off the guns as they went. He ordered everyone to sit on the couch and told them to stay there. He told Keller that if he left, he would kill Mitchell. Holiday made repeated threats to kill everyone if the police came. He then ordered Mitchell to take him to her house to get some more gasoline. They retrieved two five gallon cans of gasoline and returned to Wilkerson's house. Keller was gone, but the girls were still on the couch. Holiday told Mitchell to "soak" the recliner and furniture with the gas. Mitchell poured gas on the recliner in the living room, poured it around the room, into the laundry room and around the washer and dryer, and into and around Wilkerson's bedroom. She did not pour any gasoline on or around the couch where the children were sitting. She saw Holiday bend down and then the fire started. The fire followed the path of the gasoline, and blocked Mitchell from going back into the living room for the children. Mitchell ran outside. Holiday was standing outside

3

watching the fire.  He told Mitchell to get in the car, but she ran into the woods.  Holiday left in Mitchell's car as police were arriving.  He rammed a police car and drove off.

In the meantime, Wilkerson had run to the nearest neighbor's house for help.  The neighbors called 911.  As Wilkerson ran back down the road to her house, she saw Mitchell's car coming toward her.  The car sped up and attempted to run her down but Wilkerson escaped into the woods.  The car backed up and sped off as it was pursued by a police car.  When Wilkerson arrived back at her house, it was engulfed in flames.  Wilkerson's three children died in the fire.

Holiday was apprehended by police after a high-speed chase.  Holiday had two cigarette lighters in his pocket when he was arrested.  He was treated for burns on his arms, hands, and face.  Holiday's pistol and Keller's shotgun were found later inside the house.

*Id.* at *4–7.

The State of Texas ("State") brought three charges of capital murder, in three separate indictments, for the deaths of each of the three children. *Holiday v. Stephens*, No. H-11-1696, 2013 U.S. Dist. LEXIS 98004, *6 (S.D. Tex. July 10, 2013) (hereinafter "Dist. Ct. Op.").  Each indictment alleged the capital murder of one of the three children and that Holiday "intentionally or knowingly cause[d] the death of [the named victim] by burning said individual with fire." *Id.*  One indictment charged Holiday with murdering more than one person during the same criminal transaction, and each of the other two indictments charged the murder of an individual under the age of six. *Id.*

According to the district court on federal habeas review, Holiday's intent was "hotly" disputed at trial. *Id.*  The district court summarized the dispute as follows:

The prosecution emphasized statements Holiday made foreshadowing the murder.  The State highlighted Holiday's actions and statements during the crime that manifested a murderous intent.  The prosecution presented scientific evidence

excluding the possibility that an appliance had accidentally ignited the gasoline. Importantly, Ms. Mitchell testified that she saw Holiday "ben[d] down and the fire started." She did not see a match or a lighter in his hand, but the fire started "immediately as he reached down."

The defense argued that reasonable doubt existed as to whether Holiday intended to ignite the gasoline and kill the children. The defense challenged Ms. Mitchell's recollection because she had previously recounted the events of that evening without mentioning that Holiday bent down before the fire started. The defense presented testimony from a fire expert who opined that nearby appliances may have accidentally ignited the gasoline fumes. The jury, nonetheless, found Holiday guilty on each count of capital murder.

*Id.* at *6–9 (alteration in original) (citations omitted).

In June 2022, a jury convicted Holiday of capital murder. Though the three cases were tried together, the jury received a separate charge for each case, and the court rendered three separate judgments.

In a separate penalty phase, the jury considered evidence pertaining to mitigation and future dangerousness, and determined Holiday's sentence. The district court summarized the evidence presented during the penalty phase as follows:

The State adduced evidence that Holiday confessed to another inmate that he had actually sexually assaulted Tierra twice. In addition, Holiday had previously sexually assaulted his maternal aunt and a cousin. His criminal behavior toward family members also included a physical assault on his mother. A forensic psychiatrist testified that Holiday suffered from an antisocial personality disorder, rendering him likely to commit violent acts in the future.

The defense called several witnesses in an effort to mitigate against a death sentence. Friends and family members provided background information about Holiday's childhood, describing him as a respectful, church-going individual. The defense also secured the services of a psychiatrist who testified that Holiday suffered from depression and had poor internal mechanisms for coping with

stress and frustration.  The defense's closing argument urged the jury to give Holiday a life sentence.

Dist. Ct. Op. at *9–10.  The jury answered special issues pursuant to Article 37.071 of the Texas Code of Criminal Procedure and the trial court, based on those answers, sentenced Holiday to death.

On direct, automatic appeal, the TCCA affirmed Holiday's conviction and sentence.  Dist. Ct. Op. at *10–11.  The United States Supreme Court denied his petition for a writ of certiorari.  *Id.* at *11.

While his direct appeal was pending, Holiday filed an application for state habeas corpus relief.  The state habeas trial court denied relief.  In doing so, the court forewent an evidentiary hearing and adopted the State's proposed findings of fact and conclusions of law, which recited much of the TCCA's opinion on direct appeal.  In turn, the TCCA adopted the state habeas court's recommendation to deny Holiday's application for writ of habeas corpus.  Dist. Ct. Op. at *11.

Holiday then filed a federal petition for a writ of habeas corpus that the district court denied on July 10, 2013.  The district court also denied Holiday a COA on each of his claims.  Holiday now asks this Court to issue a COA on numerous claims.

## II.    JURISDICTION AND STANDARD OF REVIEW

To appeal the district court's denial of his habeas petition, Holiday must first obtain a COA pursuant to 28 U.S.C. § 2253(c)(1).  *See Miller–El v. Cockrell*, 537 U.S. 322, 335–36 (2003).  Because the district court did not grant a COA on any of Holiday's claims, we have jurisdiction at this juncture only to consider whether a COA should issue on any of his claims.  *E.g.*, 28 U.S.C. § 2253(c); *Miller–El*, 537 U.S. at 335–36.

A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner

satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller–El*, 537 U.S. at 327.

Specifically, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Feldman v. Thaler*, 695 F.3d 372, 377 (5th Cir. 2012) (alteration omitted) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). The issue is "the debatability of the underlying constitutional claim, not the resolution of that debate." *Miller–El*, 537 U.S. at 342. Indeed, "a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id.* at 338. Thus, this Court's examination is a "threshold inquiry [that] does not require full consideration of the factual or legal bases adduced in support of the claims," but rather "an overview of the claims in the habeas petition and a general assessment of their merits." *Id.* at 336. "In death penalty cases, any doubts as to whether the COA should issue are resolved in favor of the petitioner." *Moore v. Quarterman*, 534 F.3d 454, 460 (5th Cir. 2008).

"[T]he determination of whether a COA should issue must be made by viewing the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)." *Barrientes v. Johnson*, 221 F.3d 741, 772 (5th Cir. 2000). Section 2254(d) provides that a state prisoner's application for a writ of habeas corpus "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim":

No. 13-70022

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Section 2254(d)(1) encompasses two distinct inquiries. A state court decision is "contrary to" clearly established federal law "if 'the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.'" *Hoffman v. Cain*, 752 F.3d 430, 437 (5th Cir. 2014) (alterations in original) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)). By contrast, a state court decision "involves an 'unreasonable application' of clearly established federal law if 'the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* at 437 (alterations in original) (quoting *Williams*, 529 U.S. at 413). As to this latter inquiry, we "focus on 'the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence.'" *Id.* (quoting *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (per curiam)). To determine whether the state court unreasonably applied a Supreme Court decision, a federal habeas court "must determine what arguments or theories supported or, . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011).

No. 13-70022

A challenge to a state court decision under § 2254(d)(2) challenges the state court's determination of the facts. "[A] determination of a factual issue made by a State court shall be presumed to be correct" and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Section 2254(e)(1) is the 'arguably more deferential standard.'" *Hoffman*, 752 F.3d at 437 (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)). A factual determination is "not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood*, 558 U.S. at 301.

Overall, § 2254(d) establishes a "highly deferential standard for evaluating state court rulings, which demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (citation and internal quotation marks omitted). Indeed, state courts are presumed to "know and follow the law." *Id.* The petitioner has the burden of showing that "there was no reasonable basis for the state court to deny relief." *Richter*, 131 S. Ct. at 784. "For claims that are not adjudicated on the merits in the state court," however, we do not apply the deferential scheme laid out under § 2254(d) and instead "apply a *de novo* standard of review." *Hoffman*, 752 F.3d at 437 (citation omitted).

## III.   DISCUSSION

Holiday's application for a COA raises numerous claims for appeal. We address Holiday's claims by referring to his original numbering, and grouping certain claims together where appropriate.

### A.   Sufficiency of the Indictments (Claims 5 and 6)

In claims 5 and 6, Holiday challenges the sufficiency of the indictments. The Sixth Amendment requires only that a "reasonable construction of the indictment would charge the offense for which the defendant has been convicted." *McKay v. Collins*, 12 F.3d 66, 69 (5th Cir. 1994) (citation omitted).

This standard should be applied with practical, not technical considerations. *Id.* Thus, the indictment "need not be expressed in any specific terms," but need only include the "essential elements of the offense" under state law. *Id.* (citation omitted). We look to the "plain and sensible meaning of the language used" in the indictment, and bear in mind that this test "involves minimal constitutional standards, not whether a better indictment could have been written." *Id.* (citations and internal quotation marks omitted). We will not consider such claims, however, "[w]hen it appears . . . that the sufficiency of the indictment was squarely presented to the highest court of the state on appeal, and that court held that the trial court had jurisdiction over the case." *Alexander v. McCotter*, 775 F.2d 595, 598 (5th Cir. 1985) (alterations in original) (citation and internal quotation marks omitted).

Holiday argues that the indictments employed generic terms and did not allege that he "start[ed] the fire," but only that he "caused the death of an individual . . . by burning said individual with fire." This, Holiday maintains, "allowed for many possible factual scenarios to result in conviction," such as that Mitchell poured gasoline throughout the house which was then inadvertently ignited by a pilot light. "Unhinged from a constitutionally specific indictment," Holiday continues, "the State was able to advance several theories of guilt based upon a theory that Holiday was criminally responsible for the conduct of [Mitchell]."

Reasonable jurists could not debate the district court's rejection of Holiday's claims under *McCotter*. The TCCA found the indictment sufficient because it alleged how the victims died—"by being burned in a fire"—and that "Holiday acted intentionally or knowingly in causing such deaths." TCCA Direct App. at *26–27. Indeed, Holiday concedes that the TCCA held, "on the merits of Holiday's challenge to the sufficiency of the indictments, that they satisfied state law." Because the claims were squarely presented to the TCCA

and upheld, the district court correctly observed that this "should end the inquiry." Dist. Ct. Op. at *47 (quoting *McCotter*, 775 F.2d at 599). Accordingly, we decline to issue a COA on either claim 5 or 6.

In any event, we agree with the TCCA. Even if the indictment could have been better written with a charge that Holiday caused the deaths by *starting* the fire, a plain and sensible reading of the indictment would nevertheless charge Holiday with the offense for which he was convicted. Holiday fails to show that the indictment was "so fatally defective that under no circumstances could a valid conviction result from facts provable under the indictment." *See Liner v. Phelps*, 731 F.2d 1201, 1203 (5th Cir. 1984). Jurists of reason could not debate otherwise.

## B. Sufficiency of the Evidence (Claim 1)

In claim 1, Holiday challenges the sufficiency of the evidence. "Our review of the sufficiency of the evidence is highly deferential to the verdict." *United States v. Moreno–Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011) (citation and internal quotation marks omitted). To be sufficient, "[t]he evidence need not exclude every reasonable hypothesis of innocence or be completely inconsistent with every conclusion except guilt, so long as a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *United States v. Terrell*, 700 F.3d 755, 760 (5th Cir. 2012). Thus, "'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Moreno–Gonzalez*, 662 F.3d at 372 (alteration omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Holiday contends that the record evidence could not reasonably support a finding that he intentionally or knowingly started the fire, or that he actually

started the fire.[1]  In support, he argues that Mitchell never testified that she saw him actually set the fire, but only that she saw him bend down as if to do so, and that his lighters revealed no evidence that he started the fire.  Rather, according to Holiday, "[a]n accidental ignition is a more reasonable inference" because: Holiday was burned, dropped his pistol, left his shotgun in the house, and was not near an exit when the fire started; Holiday's expert found no evidence to suggest that the fire was started intentionally; and, in contrast to the state expert's testimony, the time it takes for vapors to move through the house cannot be accurately predicted.

On direct appeal, the TCCA summarized the evidence supporting a finding that Holiday acted intentionally or knowingly, and found such evidence sufficient:

> Holiday was worried and angry about the sexual-assault charges against him.  In the months before the offenses, Holiday continually harassed and threatened Wilkerson.  He threatened to kill her and "make her pay."  He told others that he was going to burn down her house.  His actions show a planned and calculated effort.  He purchased a gun and practiced shooting on the day of the offenses.  He arranged to be driven out and dropped off at Mitchell's house in the country.  He dressed in black clothing and armed himself with a can of gasoline, cigarette lighters, a gun, and ammunition.  He demonstrated his disregard for the lives of the children when he poured gasoline on and around the car they were sitting in and attempted to light it.  When that did not work, he ordered everyone into the house with instructions to remain there while he went to get more gasoline.  He terrorized Mitchell, Keller, and the children by ordering them around at gunpoint.  If he had not wanted to endanger the children, he would not have allowed them to remain in the house while he directed the soaking of various items of furniture and the pouring of gasoline throughout

---

[1] At the time of Holiday's crimes, a person committed capital murder under Texas law if he committed murder as defined under Tex. Penal Code § 19.02(b)(1) (2003) ("intentionally or knowingly causes the death of an individual") and, in pertinent part, "murder[ed] an individual under six years of age," *id.* at § 19.03(a)(8), or "murder[ed] more than one person . . . during the same criminal transaction," *id.* at § 19.03(a)(7)(A).

> the house.  Rather than demonstrate shock, remorse, or anguish at the fact that the children were unreachable inside the burning house, Holiday attempted to apprehend Mitchell, and then fled the scene, ramming a police car, and leading police on a manic high-speed chase.

TCCA Direct App. at *9–10.  Holiday does not dispute these findings.  Viewing such evidence in the light most favorable to the verdict, the TCCA reasonably concluded that a rational trier of fact could have found beyond a reasonable doubt that Holiday intentionally or knowingly caused the death of the victims. This is particularly so given the evidence that Holiday had already once attempted to cause the children's death when he attempted to light on fire the car with the children seated inside.  Moreover, Mitchell testified that, after she spread the gas at Holiday's direction, she saw Holiday bend down and then the fire started.  Viewed in the light most favorable to the verdict, Mitchell's testimony permits a rational trier of fact to find beyond a reasonable doubt that Holiday actually started the fire.

Holiday's argument largely focuses on alternative hypotheses, but a finding that the evidence was sufficient "need not exclude every reasonable hypothesis of innocence." *Terrell*, 700 F.3d at 760.  Accordingly, no reasonable jurist could debate whether the TCCA reasonably found that a rational trier of fact could have found beyond a reasonable doubt that Holiday intentionally or knowingly caused the deaths of the children and actually started the fire.

## C.  Evidentiary Rulings (Multiple Claims)

This Court "may not consider the correctness of the evidentiary rulings of the Texas courts" under state law, but only "whether there has been a constitutional infraction of [petitioner's] due process rights which would render the trial as a whole 'fundamentally unfair.'" *Trussell v. Estelle*, 699 F.2d 256, 259 (5th Cir. 1983) (quoting *Nelson v. Estelle*, 642 F.2d 903, 906 (5th Cir. 1981)) (internal quotation marks omitted).  In other words, "[a] state court's

evidentiary rulings present cognizable habeas claims only if they run afoul of a specific constitutional right or render the petitioner's trial fundamentally unfair." *Johnson v. Puckett*, 176 F.3d 809, 820 (5th Cir. 1999).

Demonstrating fundamental unfairness presents a high burden for the petitioner to meet:

> Due process is implicated only for rulings "of such a magnitude" or "so egregious" that they "render the trial fundamentally unfair." It offers no authority to federal habeas courts to review the mine run of evidentiary rulings of state trial courts. Relief will be warranted only when the challenged evidence "played a crucial, critical, and highly significant role in the trial."

> The due process inquiry must consider the significance of the challenged evidence "in the context of the entire trial." We have held that the Due Process Clause does not afford relief where the challenged evidence was not the principal focus at trial and the errors were not "'so pronounced and persistent that it permeates the entire atmosphere of the trial.'" This is a high hurdle, even without AEDPA's added level of deference.

*Gonzales v. Thaler*, 643 F.3d 425, 430–31 (5th Cir. 2011) (citations omitted).

Put differently, the evidentiary ruling, even if in error, "is still subject to the doctrine of harmless error." *United States v. Hall*, 500 F.3d 439, 443 (5th Cir. 2007) (citation omitted). To demonstrate actual prejudice, a petitioner must show that the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation and internal quotation marks omitted). "The error will not require reversal if 'beyond a reasonable doubt the error complained of did not contribute to the verdict obtained.'" *Hall*, 500 F.3d at 443 (citation omitted). In determining whether the error was harmless, this Court considers "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of

cross-examination otherwise permitted, and of course, the overall strength of the prosecution's case." *United States v. Edwards*, 303 F.3d 606, 623 (5th Cir. 2002) (citation and internal quotation marks omitted).

i.     Nurse Riley's Testimony (Claims 3 and 4)

At issue in claims 3 and 4 is the trial court's admission of testimony from Nurse Jane Riley ("Nurse Riley") regarding certain out-of-court statements by Tierra.     The Confrontation Clause bars the admission of "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had . . . a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004).  "A statement that is not testimonial cannot violate the Confrontation Clause." *Brown v. Epps*, 686 F.3d 281, 286 (5th Cir. 2012) (alteration and citation omitted).  The Supreme Court has clarified that a "statement is not testimonial if it is procured for the primary purpose of allowing police to assist in an ongoing emergency or if it is procured under other circumstances where the primary purpose is not to create an out-of-court substitute for trial testimony." *Id.* at 287 (citation omitted).

> In determining whether such circumstances exist, courts consider whether the individual "was speaking about events as they were actually happening, rather than 'describ[ing] past events'"; whether the statements enabled police to resolve an ongoing emergency; and whether the statements were made in a formal setting.  The Court has emphasized that "[a]n objective analysis of the circumstances of an encounter and the statements and actions of the parties to it provides the most accurate assessment of the 'primary purpose of the interrogation.'"

*Id.* (alterations in original) (emphasis and citations omitted).  Moreover, we have previously held that "statements made for the purposes of obtaining medical treatment during an ongoing emergency are not testimonial under *Crawford*."  *United States v. Santos*, 589 F.3d 759, 763 (5th Cir. 2009). Conversely, "[statements] are testimonial when the circumstances objectively

indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822 (2006).

Here, upon suspicion that Tierra was sexually assaulted, Wilkerson took Tierra to see Dr. Ali Al-Himyary ("Dr. Al-Himyary"), who contacted Child Protective Services ("CPS"). Nurse Riley later examined Tierra on a referral from CPS. At trial, Nurse Riley testified about Tierra's statements during this examination. In relevant part:

> The State: Now, what you can remember or what you can recall from reviewing your notes, please use—please tell the jury what you said to the child and what the child said to you as you were doing this medical history.
>
> . . . .
>
> Nurse Riley: I asked her if she knew why she was there with me and she said no. And then I asked her if she knew why there was blood in her panties and she said no. And then I asked her if something had happened to her and she said yes. And then I asked her if anyone was with her when something happened and she stated my step daddy. I then asked her—I told her it was important for her to tell me what happened to her so that I could make sure she was okay. At that point she put her head down and she didn't say anything else. And then I asked her if someone had told her not to tell and she said yes, my step daddy. And then I asked her what he had said and she said that he said if I told anybody he would get in a lot of trouble.

Holiday argues that Nurse Riley's testimony about the out-of-court statements from Tierra violated the Confrontation Clause under *Crawford* because the circumstances show that Tierra's out-of-court statements to Nurse Riley were testimonial in nature. According to Holiday, the interview occurred three days after Tierra had been examined by Dr. Al-Himyary, who already determined that she was sexually assaulted. Nevertheless, Holiday continues,

16

either the Madisonville Police Department or CPS referred Tierra to Nurse Riley, who worked with a forensic interviewer. Further, the questions themselves—who Tierra was with and whether or not that person asked her to not tell anyone—did not serve the purpose of diagnosis and treatment but investigation.

Holiday contends in the alternative that, even if the statements were not testimonial, they lacked sufficient indicia of reliability and were hearsay because the interview was not recorded, consisted of leading questions, and was inconsistent with the recorded interview of the defense's rebuttal witness, Dr. Fred Fason, a psychiatrist. Holiday also raises these same claims as a violation of his Fifth and Fourteenth Amendments Due Process rights. Whatever the alleged error, Holiday argues that it was harmful because Nurse Riley's testimony was the only evidence implicating him as the one who sexually assaulted Tierra.

The TCCA proceeded directly to a harmless error analysis and found that any purported error was harmless:

> Wilkerson testified that she suspected Holiday when she discovered the bloody panties. [Dr. Al-Himyary, the first doctor to examine Tierra after the alleged sexual assault,] testified that Wilkerson informed him that she suspected Holiday of abusing Tierra. Wilkerson testified that she filed charges against Holiday, that she received a protective order against him, that he was evicted from her home, and that he was indicted for sexually assaulting Tierra. There was testimony from several witnesses referring to the pending charges.

TCCA Direct App. at *24–25. From this, the TCCA reasonably concluded that "[t]he statements did not inject any new facts or embellish the facts to any extent beyond that testified to by other witnesses." *Id.* at *24. Holiday does not argue that the TCCA unreasonably determined these facts, which squarely rebuts his argument that Nurse Riley's testimony was the only evidence that

he sexually assaulted Tierra.  Accordingly, Holiday has not demonstrated that fairminded jurists could debate the district court's denial of this claim.

    ii.    <u>Expert Testimony from Dr. DeHaan (Claims 10 and 40–53)</u>

In numerous claims, Holiday challenges the admission of Dr. John DeHaan's ("Dr. DeHaan") testimony, and contends that the testimony was false or misleading and that the State withheld related evidence.  "To establish a due process violation based on the government's use of false or misleading testimony, the defendant must show (1) that the witness's testimony was actually false, (2) that the testimony was material, and (3) that the prosecution knew the witness's testimony was false." *Fuller v. Johnson*, 114 F.3d 491, 496 (5th Cir. 1997) (citations omitted).  And to prevail on a claim that the state withheld evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), the petitioner must prove: "(1) that the 'evidence at issue [is] favorable to the accused, either because it is exculpatory, or because it is impeaching;' (2) that the 'evidence [has] been suppressed by the State, either willfully or inadvertently;' and (3) that 'prejudice [has] ensued.'" *Summers v. Dretke*, 431 F.3d 861, 874 (5th Cir. 2005) (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)).

Here, the State retained Dr. DeHaan to investigate the ignition and course of the flames that burned down Wilkerson's house. Dist. Ct. Op. at *54. Dr. DeHaan was a forensic scientist who had worked as a criminologist for thirty-three years; "for the past twenty years his focus had been on fire and explosion investigations or laboratory analysis." TCCA Direct App. at *46. "[He] testified that in twenty-five years of conducting such research and analysis, he had orchestrated and set about five hundred structure fires, one hundred and twenty vehicle fires, and about two hundred small-scale tests involving furniture and fuels." *Id.* at *47.  The district court noted that:

> Dr. DeHaan's testimony was especially important to the State because (1) he excluded appliances as [a possible] ignition source; (2) he opined that burns on Holiday's hands were consistent with the State's theory that he bent down to light the gasoline; and (3) he suggested that Holiday himself may have spread additional gasoline unobserved by Ms. Mitchell, bolstering the State's argument that Holiday intended to kill the children.

Dist. Ct. Op. at *54.

Holiday alleges that Dr. DeHaan's testimony was false and misleading, constituted unreliable scientific testimony, and that the State withheld evidence to the extent it knew of these deficiencies. In essence, Holiday argues that Dr. DeHaan's testimony was based on "junk science" because he "did not try to recreate the factors involved in this fire by modeling [or] rely on any known scientific principles that relate to the diffusion of gasoline molecules in a room to determine what possible concentrations might exist at any location in that room." Holiday also argues that Dr. DeHaan disregarded certain data contrary to his hypothesis and misleadingly testified that Holiday's injuries were "consistent with" Dr. DeHaan's theory. These flaws, according to Holiday, amounted to false or misleading testimony in violation of his Eighth, Fifth, and Fourteenth Amendment rights. He further asserts that the court should have excluded DeHaan's testimony under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and that there was a *Brady* violation "[t]o the extent" that the State was aware of the contradictory data.

As to his first claim, Holiday makes no attempt to show that the prosecution knew Dr. DeHaan's testimony was false. Indeed, under his third claim, Holiday argues that there was a *Brady* violation only "[t]o the extent that the [State was] actually aware[2] of [these] deficiencies." Because Holiday

---

[2] We note that a *Brady* violation is not limited to instances where the prosecutor had actual knowledge, as Holiday assumes. Rather, "*Brady* requires the 'individual prosecutor [] to learn of any favorable evidence known to the others acting on the government's behalf in

makes no effort to show, as he must, that the State knew of the alleged falsity, *see Fuller*, 114 F.3d at 496, or that the State either willfully or inadvertently suppressed such evidence, *Summers*, 431 F.3d at 874, Holiday's application for a COA on his first (false or misleading testimony) and third (*Brady*) claims fails.

Holiday also requests a COA as to the admissibility of Dr. DeHaan's testimony, but this too fails. As the TCCA found:

> [Dr. DeHaan] explained that the process of gathering information and assessing evidence during a fire investigation begins with observations from witnesses. He also testified that it includes: (1) gathering information from the scene, such as the amount of damage, the time frames of detection, suppression, and extinguishment; (2) testing various possibilities as to manner and location of ignition; (3) assessing the way the fire spread and its time frames; (4) studying the physical evidence; and (5) testing and retesting the possibilities to establish the reliability of the various indicators to arrive at a conclusion about the ignition. DeHaan testified that this method of gathering information, reviewing the physical evidence, and testing possibilities is used in a "very high percentage" of fire investigations and is a valid process that has been verified through numerous tests, training exercises, and demonstration fires. DeHaan testified that he properly applied these established and verified techniques in making his determination in the instant case.

TCCA Direct App. at \*47–48. Holiday simply points to what Dr. DeHaan did not do, but Holiday does not explain why those omissions rendered this methodology scientifically unreliable.

To the extent there existed evidence contradicting Dr. DeHaan's findings, "[c]ommon sense dictates that some speculation is involved in attempting to reconstruct a scene that was destroyed by fire, or in assessing a

---

the case, including the police.'" *Pitonyak v. Stephens*, 732 F.3d 525, 533 (5th Cir. 2013) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). This clarification does not affect our holding.

burn injury based upon numerous variables." *Id.* at *49. "That a factfinder will have to assess how much those matters bear upon evaluating DeHaan's overall conclusions in light of the expertise he brings to the issues goes to the weight of DeHaan's testimony and not its admissibility." *Id.* We do not find the TCCA's approach here unreasonable or that the admission of Dr. DeHaan's testimony rendered the trial fundamentally unfair. *See Story v. Collins*, 920 F.2d 1247, 1255–56 (5th Cir. 1991) (holding admission of allegedly inadmissible expert testimony not fundamentally unfair because "[petitioner's] attorney had ample opportunity to cross-examine [the expert] on her testimony; and in light of [the expert's] professional status, education, and experience, [petitioner had] not shown that the admission of [the expert's] testimony rendered his trial fundamentally unfair"). Reasonable jurists could not debate otherwise.

### iii.    Evidence of Rape Offense (Claim 11)

In this claim, Holiday disputes the trial court's admission of evidence pertaining to the sexual assault of Tierra and claims that its admission was unfairly prejudicial.

In *Old Chief v. United States*, 519 U.S. 172 (1997), the Supreme Court noted "the familiar, standard rule that the prosecution is entitled to prove its case by evidence of its own choice, or, more exactly, that a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it." *Id.* at 186–87. The Court described this rule as "unquestionably true as a general matter." *Id.* at 187. But the rule has "virtually no application when the point at issue is a defendant's legal status, dependent on some judgment rendered wholly independently of the concrete events of later criminal behavior charged against him." *Id.* at 190. Thus, the Court held that if the purpose of the evidence is to prove the defendant's status as a convict (to satisfy a prior-conviction element of the

offense), then a court abuses its discretion by denying a defendant's offer to stipulate to that status. *Id.* at 191–92; *see also United States v. Hollis*, 506 F.3d 415, 419 (5th Cir. 2007) ("As recognized in *Old Chief v. United States*, a defendant has the right to admit or stipulate to the fact of a prior felony conviction for purposes of proof of felon status." (citing *Old Chief*, 519 U.S. at 190–91)).

Holiday argues that the State should have been required, under *Old Chief*, to accept his stipulation to the sexual assault of Tierra because "offering detailed evidence" of the assault "went far beyond establishing motive and fundamentally deprived Holiday of a fair trial." Holiday, however, does not elaborate why *Old Chief* should apply to this case. We hold it does not.

The Supreme Court expressly stated in *Old Chief* that its holding "is limited to cases involving proof of felon status." 519 U.S. at 183 n.7. As the Court described:

> What we have said shows why this will be the general rule when proof of convict status is at issue, just as the prosecutor's choice will generally survive a Rule 403 analysis when a defendant seeks to force the substitution of an admission for evidence creating a coherent narrative of his thoughts and actions in perpetrating the offense for which he is being tried.

*Id.* at 191–92. We reject Holiday's attempt to fit this case under the former scenario—his legal status is simply not a point of issue here. Rather, this case falls squarely under the latter scenario. Indeed, the district court found that "Holiday's sexual assault of Tierra set into motion a series of circumstances leading to his actions on the night of the murder. In connecting a line from the extraneous sexual assault to the murders, the State did not cross an impermissible boundary that violated fundamental fairness." Dist. Ct. Op. at *74. In other words, the evidence "creat[ed] a coherent narrative of [Holiday's] thoughts and actions in perpetrating the offense." *See Old Chief*, 519 U.S. at

No. 13-70022

192.  Presenting such evidence was the State's choice to make, and to require the State "[t]o substitute for such a picture a naked admission might have the effect to rob the evidence of much of its fair and legitimate weight." *See id.* at 187 (quoting *Parr v. United States*, 255 F.2d 86, 88 (5th Cir. 1958)) (internal quotation marks omitted).

Holiday does not dispute the high probative value of the challenged evidence that he sexually assaulted Tierra.  Nor does he cite any authority requiring, as a constitutional right, the State to accept his stipulation to the same effect.  Holiday's only cited authority in support of his argument, *Old Chief*, does not apply to this case.  Accordingly, Holiday has not demonstrated that the admission of the evidence was so prejudicial that it ran afoul of a specific constitutional right or rendered his trial fundamentally unfair. Reasonable jurists could not find this debatable.

iv.    Expert Testimony of Dr. Gripon (Claims 14 and 15)

In claims 14 and 15, Holiday challenges the trial court's admission of the expert testimony of Dr. Edward B. Gripon ("Dr. Gripon").

The district court summarized Dr. Gripon's testimony:

During the penalty phase of trial, the prosecution called Dr. Edward B. Gripon, a board-certified psychiatrist, as a rebuttal witness to testify to Holiday's future threat to society.  Dr. Gripon did not interview or examine Holiday, but reviewed information that included offense reports, school records, and historical information.  Before Dr. Gripon testified before the jury, the trial court held a Daubert hearing regarding his opinions.  Dr. Gripon detailed his extensive experience evaluating criminal defendants. With specific relevance to his role at this trial, Dr. Gripon testified that the psychological community recognizes several scientifically valid methods of assessing future dangerousness, including: (1) a pure clinical model; (2) a clinical approach that includes consideration of certain demographic and actuarial information; and (3) a pure actuarial model.  Dr. Gripon explained that his evaluations generally followed the second approach, allowing for mental-health history, past behavior, and demographics to

23

influence his assessment. Dr. Gripon specifically rejected the use of the actuarial approach because it lacked adequate controls and involved immeasurable variables.

Dist. Ct. Op. at *84–85 (footnote omitted).

Holiday generally argues that the American Psychiatric Association finds future dangerousness predictions to be unreliable in capital trials. Additionally, Holiday contends that Gripon used an "unstructured clinical approach" as he "intuitively selected factors he believed were likely to predict future violence, [age and education,] rather than relying on factors that have been empirically demonstrated to relate to the risk of future violence among individuals in a particular context."

The Supreme Court, however, has already rejected general challenges—like Holiday's—to the use of future dangerousness predictions. In *Barefoot v. Estelle*, 463 U.S. 880 (1983), the Court explained that "[t]he suggestion that no psychiatrist's testimony may be presented with respect to a defendant's future dangerousness is somewhat like asking us to disinvent the wheel." *Id.* at 896. In this regard, "it makes little sense, if any, to submit that psychiatrists, out of the entire universe of persons who might have an opinion on the issue, would know so little about the subject that they should not be permitted to testify." *Id.* at 897.

Holiday's passing suggestion that such testimony would not "satisfy ordinary *Daubert*-like evidentiary standards" is unavailing. Granted, the viability of this holding in *Barefoot* has been questioned in light of the Supreme Court's ruling in *Daubert*. *See, e.g.*, *Flores v. Johnson*, 210 F.3d 456, 463–65 (5th Cir. 2000) (Garza, J., concurring). But even if questionable, Holiday's suggestion does not show that the state trial court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." *See* 28 U.S.C. § 2254(d)(1). In fact, we

have held that "*Daubert* does not apply to the standards governing the admissibility of expert evidence at a capital sentencing hearing." *Williams v. Stephens*, — F.3d ——, 2014 U.S. App. LEXIS 14816, \*20 (5th Cir. Aug. 1, 2014) (citing *United States v. Fields*, 483 F.3d 313, 341–46 (5th Cir. 2007)).

As to the reliability of Dr. Gripon's testimony, the TCCA found that, "[a]s a board-certified psychiatrist with years of experience and specializing in forensic psychology, Gripon was shown to be qualified. . . . Gripon testified that his method of assessing future-dangerousness was considered valid." TCCA Direct App. at \*74–75. Holiday, at best, points us to his own expert's testimony that "explained in detail the deficiencies of the methodology used by Dr. Gripon." But, "[w]hile Holiday points to issues that were legitimate areas for cross-examination, his objections went to the weight and not the admissibility of Gripon's testimony." TCCA Direct App. at \*75. Indeed, Holiday's counsel had ample opportunity to cross-examine Gripon, and Holiday does not challenge Gripon's qualifications. *See, e.g.*, *Fields*, 483 F.3d at 345 ("[A]s *Barefoot* noted, the adversarial system reduces any prejudicial unreliability in future dangerousness expert testimony because it can expose the flaws in such testimony."); *Story v. Collins*, 920 F.2d 1247, 1255–56 (5th Cir. 1991). Holiday therefore fails to show that the trial court's admission of Dr. Gripon's testimony rendered the trial fundamentally unfair, much less that the TCCA's assessment was unreasonable. Reasonable jurists could not debate otherwise.

v.    Expert Testimony of Reverend Pickett (Claims 16–19)

In these claims, Holiday contends that the trial court erred when it excluded the expert testimony of Reverend Carol Pickett ("Rev. Pickett"). Under the Eighth and Fourteenth Amendments, a sentencer may "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the

defendant proffers as a basis for a sentence less than death." *Jackson v. Dretke*, 450 F.3d 614, 616–17 (5th Cir. 2006) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion)).

Holiday argues that *Lockett v. Ohio* permits the sentencer to "consider . . . and base a decision to impose a life sentence upon any relevant mitigating factor." On this ground, Holiday sought to introduce Rev. Pickett to testify on what Holiday alleges to be mitigating factors: the negative effect on prison employees carrying out the execution, the lack of positive effect on victim's family, and the positive changes that an inmate can make during incarceration.

The district court denied these claims and we do not find that outcome debatable. To be sure, *Lockett* stated that the "Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S. at 604. In turn, Holiday premises his argument upon the broad notion that "any relevant mitigating factor" must be permitted. But the quoted language from *Lockett* does not exist in a vacuum. Holiday ignores the footnote appended to that quoted language: "Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Id.* at 604 n.12. This traditional authority is precisely what the state trial court exercised here.[3]

---

[3] By the same token, we reject Holiday's contention that these claims should be reviewed wholly *de novo*. He argues that the TCCA denied these claims on state law grounds without addressing the merits of his constitutional claims. But we must afford deference to the "traditional authority" the state court exercised under *Lockett*.

In this regard, the TCCA held that the trial court did not abuse its discretion when it excluded Rev. Pickett's testimony as irrelevant. The TCCA reasoned that "Pickett's testimony was not offered to provide the jury with information regarding Holiday or the circumstances of his case in particular." TCCA Direct App. at *77. "Even if Pickett's testimony could be viewed as marginally relevant," the TCCA continued, "the trial court was within its discretion to exclude it under *Rule 403*." *Id.* Thus, "[b]ecause the evidence was not particularized to the defendant, the trial court might reasonably conclude that the risk of confusing and distracting the jury substantially outweighed any probative value such evidence might have." *Id.*

We find nothing unreasonable in the TCCA's analysis. In fact, this Court has previously held that "[e]vidence of impact on friends and family does not reflect on [petitioner's] background or character or the circumstances of his crime, so [petitioner's] proffer of that evidence does not satisfy the second avenue available to him to obtain habeas relief." *Jackson*, 450 F.3d at 618. In a similar vein, it was reasonable for the TCCA to find minimal probative value in generalized testimony concerning the positive changes inmates can make—such testimony says nothing about *Holiday's* character and his propensity to rehabilitate. The district court's denial of these claims is beyond debate.

vi. Cross-Examination of Mitchell During the Penalty Phase (Claims 20–22)

Claims 20–22 concern Holiday's counsel's attempt to cross-examine Mitchell during the penalty phase. Because the State does not dispute Holiday's contention that this claim be reviewed *de novo*, we assume without deciding that *de novo* review applies.

In *Holland v. Anderson*, 583 F.3d 267, 273–80 (5th Cir. 2009), we distinguished between innocence-related evidence and evidence of the circumstances of the offense:

> The only testimony and evidence that the court prohibited [during the penalty phase] was [evidence] related to an *element* of the crime: the commission of a rape. As explained above, rape was an essential element of the original jury's capital murder conviction. Without finding rape, the jury could not have found Holland guilty of capital murder; rape was therefore not a *circumstance* of the crime. . . . The fact that Holland sought to introduce evidence to dispute an actual element of his crime of conviction—not merely evidence to *explain* the crime or to describe the *circumstances* of the crime—distinguishes this case from *Lockett* [*v. Ohio*, 438 U.S. 586 (1978) (plurality opinion)], *Eddings* [*v. Oklahoma*, 455 U.S. 104 (1982)], and their progeny.

*Id.* at 275–76 (footnote omitted). Based on this distinction, this Court held that a state was constitutionally permitted to "prohibit the introduction of new evidence of innocence at resentencing." *Id.* at 278. We reasoned that "sentencing traditionally concerns *how*, not *whether*, a defendant committed the crime." *Id.* (quoting *Oregon v. Guzek*, 546 U.S. 517, 526 (2006)) (internal quotation marks omitted). Additionally, "'the parties previously litigated the issue to which the evidence [petitioner sought to introduce at sentencing] is relevant—whether [he] committed the basic crime,' which is 'a previously determined matter.'" *Id.* (quoting *Guzek*, 546 U.S. at 526).

Holiday argues that during the guilt–innocence phase of the trial, Mitchell "was the only person to testify that Holiday took affirmative steps to light the house on fire." Holiday recounts that his "lawyer impeached [Mitchell] with prior statements and testimony she made, asserting that she did not see Holiday do anything to start the fire, and never before mentioned observing Holiday bending down at the moment the fire started." In closing argument at the guilt–innocence phase, the State attempted to explain away any inconsistency. Consequently, Holiday contends, he should have been permitted to then additionally cross-examine Mitchell during the penalty phase because he is "entitled to present evidence relevant to the mitigation

issue that would reduce his moral blameworthiness."   In Holiday's view, evidence that Mitchell was not as certain about her testimony reduces his moral blameworthiness.   This is, he maintains, "precisely the type of exonerating defense to which a defendant has a due process right to under *Holmes* [*v. South Carolina*, 547 U.S. 319 (2006),] and *Crane* [*v. Kentucky*, 476 U.S. 683 (1986)]."   Holiday concludes that if the jury were allowed to hear of such inconsistency, then "at least one juror may have concluded that Holiday did not bend over and ignite the fire and, therefore, a sentence of less than death imposed."

By Holiday's own words, he contends that he should have been permitted to introduce innocence-related evidence—i.e., "exonerating" evidence that would show he "did not bend over and ignite the fire"—during the penalty phase of his trial.   But as the TCCA found, "Mitchell had already responded to numerous pointed questions from defense counsel regarding the context in which her earlier statement and testimony were made."   TCCA Direct App. at *80.   Indeed, Holiday noted in briefing that his trial counsel impeached Mitchell.   Moreover, Holiday does not cite any authority that a second opportunity to present innocence-related evidence during the penalty phase is constitutionally mandated.   Thus, as the TCCA held, "[t]he trial court did not abuse its discretion in limiting continued questioning of Mitchell on an issue on which there had already been considerable testimony."   TCCA Direct App. at *80.   We do not find this conclusion unreasonable and hold that fairminded jurists could not debate otherwise.

### D.   Removal of Juror Sessions (Claim 2)

Claim 2 pertains to the removal of juror Servaine Sessions ("Sessions"). The Sixth and Fourteenth Amendments "guarantee a defendant on trial for his life the right to an impartial jury." *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988). Under the *Witherspoon-Witt* rule, "a veniremember may not be excluded from

sitting on a capital jury simply because she voices general objection to the death penalty or expresses conscientious or religious scruples against its infliction." *Ortiz v. Quarterman*, 504 F.3d 492, 500 (5th Cir. 2007) (citation omitted). Rather, a potential juror may be removed for cause if the individual's views "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (internal quotation marks omitted). "Whether a juror is excludable under the *Witherspoon-Witt* standard is a question of fact." *Ortiz*, 504 F.3d at 501. Thus, if the trial court removed a venireperson for cause, "[c]ourts reviewing claims of *Witherspoon-Witt* error, . . . especially federal courts considering habeas petitions, owe deference to the trial court, which is in a superior position to determine the demeanor and qualifications of a potential juror." *Uttecht v. Brown*, 551 U.S. 1, 22 (2007).

Holiday argues that the removal of Sessions violated his right to a fair jury trial under the Sixth and Fourteenth Amendments. The trial court had granted the State's challenge of Sessions for cause, over Holiday's objections, on the basis that her religious views were of such a nature that would "prevent or impair her performance of her duties" in accordance with her instructions and her oath. In Holiday's view, Sessions was not "irrevocably committed" to vote against the death penalty as required under *Witherspoon v. Illinois*, 391 U.S. 510, 522 n.21 (1968). Rather, he maintains, the TCCA unreasonably found Sessions excludable because the dismissal was only based upon her being "distressed" and having prayed, among other things. Holiday cites *Adams v. Texas*, 448 U.S. 38 (1980), for the proposition that "conflicting feelings" about the death penalty do not disqualify a person from jury service "who is able to put those feelings aside and impartially serve the simple fact-finding function called for under the special issues."

30

The State responds that, after the panel was selected but before it was sworn, Sessions approached the trial court with her concerns regarding the death penalty sentencing phase. Sessions vacillated about whether she could impose the death penalty, but both parties declined to question Sessions further. According to the State, the trial court correctly exercised its wide discretion in conducting *voir dire* and considered Session's uncertainty and agony because she was, in the TCCA's words, "distressed enough to approach the trial court after she was selected and just days before evidence was to be presented." TCCA Direct App. at *19. The State maintains that, under questioning by the judge, she repeatedly stated that she was "not sure" and could not say "one way or the other" whether she would be able to answer the special issues. *Id.* at *19–20.

We agree with the State. The district court summarized the TCCA's findings on direct appeal:

> The Court of Criminal Appeals reasoned that, "[e]ven though the nature of the sentencing phase and the jury's role in answering the special issues had been fully explained to Sessions," she still testified in a manner suggesting that "she would be impaired as a juror." The Court of Criminal Appeals emphasized that "she was distressed enough to approach the trial court after she was selected and just days before evidence was to be presented." In fact, "after receiving word of her selection," Ms. Sessions "had prayed, had read her Bible, and had not slept for two nights." Also, she expressed that she was "not sure" but "repeatedly contend[ed] that she could not say 'one way or the other' whether she would be able to answer the special issues." Ms. Sessions voluntarily "conveyed that she did not know how she would react when seated or how she would consider the special issues in the sentencing phase involving a potential death sentence." Because she was "persistently uncertain about [her] ability to follow the law," the record supported her removal from the jury.

Dist. Ct. Op. at *29–30 (alterations in original) (quoting TCCA Direct App. at *19–20). On this record, and in light of the deference owed to the state trial

court, we hold that Holiday has not shown by clear and convincing evidence that the TCCA unreasonably determined that Sessions's concerns would prevent or substantially impair her ability to make a sentencing decision. No reasonable jurists could debate this outcome.

### E. Denial of Challenges for Cause of Prospective Jurors Masters and Penny (Claims 8 and 9)

Holiday argues that the trial court erroneously denied his challenges for cause against prospective jurors Linda Masters and Kenny Penny. Where the trial court denied a challenge for cause, "the inquiry turns not on the . . . court's alleged failure to remove for cause certain prospective jurors, but rather on whether the jurors who ultimately sat were impartial." *United States v. Snarr*, 704 F.3d 368, 386 (5th Cir. 2013) (citing *Ross v. Oklahoma*, 487 U.S. 81, 86 (1988)). Therefore, a "court's erroneous refusal to grant a defendant's challenge for cause is only grounds for reversal if the defendant establishes that the jury which actually sat to decide his guilt or innocence was not impartial." *Id.* (citation and internal quotation marks omitted).

Here, Holiday removed both of these prospective jurors from the panel by peremptory strike. But Holiday does not argue in the present claim that the "jurors who ultimately sat were impartial." *See Snarr*, 704 F.3d at 386 (citation omitted). Accordingly, the district court's denial of this claim is beyond debate.

### F. "Law of Parties" Jury Instruction (Claim 12)

In claim 12, Holiday disputes the trial court's failure to instruct the jury to consider whether Mitchell was a party to the murders. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina*, 547 U.S. 319, 324

(2006) (citation omitted).   Because the State does not dispute Holiday's contention that this claim be reviewed *de novo*, we assume without deciding that *de novo* review applies.

Holiday argues that the jury charge did not properly instruct the jury "as to the proper consideration of what circumstances must be found before they [could] conclude Holiday [was] criminally responsible for the conduct of Beverly Mitchell," who had spread gasoline around the house.   Indeed, in Texas, a person in some circumstances may be "criminally responsible for an offense committed by the conduct of another."   Tex. Penal Code § 7.02.   The failure to instruct the jury as such, according to Holiday, prevented him from presenting a complete defense that someone else committed the crime.   In Holiday's view, there was sufficient evidence to show that Mitchell was also responsible for the deaths.

Here, as the TCCA found, "[t]he evidence showed that Holiday terrorized Mitchell, Keller, and the three children at gunpoint, made repeated threats of violence and murder, and randomly shot off the guns."   TCCA Direct App. at *64.   As to Mitchell specifically, "[a]t one point [Holiday] held Mitchell in a head-lock with a gun to her head.   He forced her into her car to retrieve more gasoline and then ordered her to pour it around the house."   *Id.* at *64–65.   Thus, the TCCA concluded that the trial court properly denied any such instruction, finding that "Mitchell was not a party because Mitchell could not have been convicted of the offenses.   Acting under duress and at gunpoint, she did not possess the requisite mental state to be charged with the offenses."   *Id.* at *65.

Beyond Holiday's conclusory argument that Mitchell was also responsible for the deaths, Holiday makes no effort to rebut the finding that she was acting under duress and, therefore, lacked the requisite mental state to be charged with the offense.   Rather, the record supports the TCCA's

findings and we adopt those findings here. The district court's denial of Holiday's present claim is not debatable.

### G. Prosecutorial Comments Regarding Holiday's Failure to Testify (Claim 13)

Claim 13 challenges, under the Fifth Amendment right to remain silent, certain statements made during the prosecution's closing argument. "For there to have been a denial of one's [F]ifth [A]mendment right to remain silent, the prosecutor's manifest intent in making the remark must have been to comment on the defendant's silence, or the character of the remark must have been such that the jury would naturally and necessarily construe it as a comment on the defendant's silence." *Jackson v. Johnson*, 194 F.3d 641, 652 (5th Cir. 1999) (citation omitted).

The district court divided the challenged closing arguments into three categories. The first is the State's use of hypotheticals. Dist. Ct. Op. at *80 ("If I was charged with murder . . ., but at my trial I got up and testified . . . ."). The second is the State's observation that the defendant failed to refute certain facts. *Id.* at *80–81 ("There is no dispute that there were three children killed here which means two or more people."). And the third is reference to the defense's failure to refute Holiday's inculpatory statements. *Id.* at *82 ("Those statements have not been refuted . . . .").

Holiday complains that the TCCA, as to the first two categories, used an improper test by requiring a showing of the State's "subjective investigation into the prosecutor's intent, or as the [TCCA] terms, 'manifestly intended,' or subjective investigation into the jurors' interpretation, who would 'necessarily and naturally take it as a comment.'" We disagree. In *Jackson*, we expressly endorsed the two elements Holiday now complains of—the prosecutor's "manifest intent" and whether the "jury would naturally and necessarily construe it as a comment on the defendant's silence." 194 F.3d at 652.

34

No. 13-70022

As to the third category, the failure to refute, Holiday alleges that the TCCA "summarily concluded that it was cured by instruction, without a *Chapman* [*v. California*, 386 U.S. 18 (1967)] analysis."[4] But, Holiday does not elaborate upon his argument that the TCCA unreasonably applied law to fact when it found the comment cured by instruction. His conclusory argument does not suffice. *See Trottie v. Stephens*, 720 F.3d 231, 255 (5th Cir. 2013) (finding no debatable due process violation where petitioner "offer[ed] no more than speculation that the court's curative instructions and its response to the jury note were insufficient to neutralize the prosecutor's statements"). Regardless, the Supreme Court has held that "[i]t is reasonable enough to expect a jury to comply with [a curative] instruction since, as we observed in *Griffin* [*v. California*, 380 U.S. 609 (1965)], the inference of guilt from silence is not always 'natural or irresistible.'" *Portuondo v. Agard*, 529 U.S. 61, 67 (2000) (quoting *Griffin*, 380 U.S. at 615). No reasonable jurist could debate that the TCCA's decision was not contrary to, or an unreasonable application of, federal law.

## H. Texas's Death Penalty Procedure (Claims 7 and 23–32)

Holiday presents an assortment of constitutional challenges to Texas's "12-10" rule jury instructions. We have previously described Texas's procedure under Texas Code of Criminal Procedure article 37.071 as follows:

> Under Texas law, the jury must consider two special issues before the death penalty is imposed on a capital defendant. First, the trial court is required to submit the following "aggravating" special issue to the jury: "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. Ann. art. 37.071(2)(b)(1). If the jury unanimously answers "yes," the

---

[4] The Chapman standard of review requires a court on direct review to ask whether any Fifth Amendment violation was harmless beyond a reasonable doubt. *See Chapman*, 386 U.S. at 24.

> jury must then answer the following "mitigation" issue: "[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed." *Id.* art. 37.071(2)(e)(1). If the jury unanimously answers "no," then the defendant is sentenced to death. *Id.* art. 37.071(2)(g).

> Pursuant to these provisions, the trial court was also required to instruct the jury that it must have at least 10 "no" votes to answer "no" on the aggravating special issue, and at least 10 "yes" votes to answer "yes" on the mitigation special issue—either of which answers would result in a life sentence, not death. *Id.* art. 37.071(2)(g).

*Druery v. Thaler*, 647 F.3d 535, 542 (5th Cir. 2011). The Texas Code, however, expressly prohibits informing the jury of the effect of a failure to agree on the special issues. Tex. Code Crim. Proc. Ann. art. 37.071(2)(a)(1). And with respect to mitigation evidence, article 37.071(2)(f)(4) instructs that the jury "shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness."

Holiday first challenges the constitutionality of article 37.071(2)(a)(1). He argues that the 12-10 rule violates the Eighth Amendment because it misleads jurors into believing that a sentence of life imprisonment is only possible when at least ten jurors vote "no" on the aggravating special issue or at least ten jurors vote "yes" on the mitigation special issue. In support, he cites *Mills v. Maryland*, 486 U.S. 367 (1988), and *Caldwell v. Mississippi*, 472 U.S. 320 (1985), but this argument is foreclosed by circuit precedent. *See, e.g.*, *Druery*, 647 F.3d at 542–44; *Miller v. Johnson*, 200 F.3d 274, 288–89 (5th Cir. 2000).

Holiday also argues that limiting mitigation evidence to only evidence that reduces moral blameworthiness is unconstitutional in light of *McCleskey*

*v. Kemp*, 481 U.S. 279, 306 (1986).   As Holiday correctly concedes, we have already rejected such an argument.   *See, e.g.*, *Blue v. Thaler*, 665 F.3d 647, 666–67 (5th Cir. 2011).

Finally, Holiday argues that the 12-10 rule is unconstitutional "because it does not place the burden of proof on the State that would require the jury to find beyond a reasonable doubt that there are no mitigating circumstances sufficient to warrant the imposition of life rather than death."   Holiday also argues that "the charging instrument does not give notice of the facts that will [be] proven to statutorily qualify a particular defendant for the death penalty."   Holiday concedes that this Court has rejected such attacks on the 12-10 rule, but suggests that this Court's en banc decision in *Nelson v. Quarterman*, 472 F.3d 287 (5th Cir. 2006) (en banc), has "derogated" all such rejections.   Holiday does not explain *Nelson* beyond this conclusory assertion.   Moreover, we have continued to reject such attacks on the 12-10 rule after *Nelson*.   *See, e.g.*, *Druery*, 647 F.3d at 544–45, 546–47.   Holiday does not show that reasonable jurists could debate the district court's disposition of these claims.

## IV.   CONCLUSION

We conclude that the district court's disposition of Holiday's claims could not be the subject of debate amongst reasonable jurists.   In addition to the reasons stated herein, we adopt the district court's detailed and well-reasoned memorandum opinion and order with respect to each claim.   Accordingly, Holiday's application for a COA on the claims presented here is DENIED.